Childs v. Jones.

WILLIAM CHILDS et al.

*v.*

SAMUEL JONES et al.

Complainants bought in, at a foreclosure sale, for their security for debt due them from J., a small farm belonging to him. The debt was money paid by them, at his request, for an encumbrance on the farm, and the purchase-money at the foreclosure sale. Whether J.'s consent to their disposition of it was a prerequisite or not is disputed, and that it was is not established by the

Childs *v.* Jones.

testimony. They sold a portion of the farm for what appears to have been a fair price, although against J.'s protest as to the price at the time; but he did not offer to redeem nor produce any one who would give ·a better price, nor take any step to stop the sale.—*Held*, that complainants are not chargeable with anything more for that part of the property which they sold than the net price which they obtained.

Bill for relief &c. On final hearing on pleadings and proofs.

*Mr. S. H. Little*, for complainants.

*Mr. A. Mills*, for Jones and wife.

THE CHANCELLOR.

This suit is brought to obtain for the complainants the benefit of a judgment recovered in the supreme court of this state, December 16th, 1876, by the defendant Samuel Jones against George Hedden, for $6,129.48. The judgment is now held by the defendant Maria L. Jones, wife of Samuel Jones, under an assignment thereof to her, dated November 17th, 1879, made by Dr. Willett, one of the complainants, to whom, on the 12th of August of that year, Jones assigned it. It is alleged by Jones and his wife that it was assigned to Willett (who is Mrs. Jones's brother) merely in order that he might assign it to her, and the assignment from him to her so states. The claim which the complainants make to it is based upon an alleged agreement between them and Jones, made on or about the 11th of August, 1879, by which they were to advance and pay for his benefit $6,000 in obtaining the assignment of a mortgage on land (a small farm) in Morris county, given by Jones to the National Iron Bank of Morristown, and $772.27 on account of a decree of foreclosure obtained in this court by Nathan A. Cooper upon a prior mortgage upon the same property, and were to buy the mortgaged premises at the sheriff's sale under the foreclosure and take a deed for them in their own names. They allege that it was agreed between them and Jones that, in order to secure the repayment to them of the $6,772.27 and the additional sum which they might be required to pay for the property, it was agreed that they should hold the farm, and that Jones should

confess a judgment to them for the $6,772.27 and assign to them the Hedden judgment as collateral security for the same debt. They paid the $6,772.27 and bought in the property August 18th, 1879, at the sheriff's sale, for $3008.20, which they paid, and took title in their own names. There was repaid to them for error in the decree the sum of $66.65. The judgment against Jones, in their favor, was confessed on the same day for $6,772.27, and costs. They allege that the assignment of the Hedden judgment by Jones to them was drawn and signed on the 12th of August, 1879, and that it was left in the office of the lawyer by whom it was drawn, and who acted in the matter both for the complainants and Jones, and that afterwards, Jones's son, being in the lawyer's office, and seeing it lying upon a table there, canceled it without any authority to do so, by tearing off Jones's signature, and they say that then, probably, the lawyer destroyed it as being of no value. Subsequently the complainants found that Jones's wife claimed to be the owner of the judgment. The complainants obtained no money upon the confessed judgment. A part of the property (a little less than an acre) bought at the sheriff's sale was, with certain water privileges, taken by condemnation by the proprietors of the Morris aqueduct in or about 1880, for which the complainants received $140, and in 1881 they sold to Charles G. Foster another part of it for $4,520, out of which they paid $113 to the real estate agent who found the purchaser, for his commissions, and there is still a part of the property unsold. They pray an account, and that Mrs. Jones may be held to be trustee of the Hedden judgment for them, and may be required to collect the money due upon it, and out of it pay the money due them. The defendants, Jones and wife, have answered. They deny that it was part of the agreement between Jones and the complainants that he should assign the Hedden judgment to them, and allege that the judgment was *bona fide* assigned to Mrs. Jones to secure her for money due her from her husband; and they allege that it was part of the agreement between the complainants and Jones that the complainants should not sell the farm without his consent. They allege also that the complain-

Childs *v.* Jones.

ants sold to Foster, not only without Jones's consent, but against his wish, and that the property was worth two or three times as much as the price—$4,520—which the complainants obtained for it ; and they insist that the complainants should be charged in the account, not merely with the amount received, but with the price which they might and ought to have obtained.

The proof does not sustain the allegations of the bill in regard to the assignment of the Hedden judgment to the complainants. It is true both of the complainants testify that it was part of the agreement that that judgment should be assigned to them, and Mr. Werts, the lawyer, says that he thinks he drew an assignment accordingly, but he has no recollection of it apart from a charge upon his fee-book against Jones, under date of August 12th, 1879, for drawing an assignment of a judgment from him to the complainants.

On the other hand, Jones swears that it was not agreed that he should assign the judgment to the complainants. He says he told them that he had promised to assign it to his wife when she signed the mortgage to the bank, but that if she would consent, they could have it by paying off the $6,000 to the bank and paying the balance of the judgment to her, and then holding the farm for the money to be paid upon the Cooper mortgage ; the proceeds of the farm, when sold, to go to her after paying the money due them on account of the Cooper mortgage, but he says they declined to accept that proposal. He says there was an assignment of the judgment from him to Dr. Willett drawn and executed that day, and that as Dr. Willett was anxious to go home (he lived in German Valley, and the transaction took place at Morristown), and therefore could not stay to execute the assignment to Mrs. Jones at that time, it was agreed that Mr. Werts should draw it, and that it should be left in Mr. Werts's office to be signed, and that he (Jones) should bring Dr. Willett in to execute it at some time when the latter should be in Morristown. He further says that afterwards, on the day of the date of the assignment to Mrs. Jones (November 17th, 1879), he took Dr. Willett into Mr. Werts's office (he says Mr. Werts was not in at the time) and got the assignment, and Dr. Willett

Childs *v.* Jones.

signed it, and he (Jones) took it, with the assignment from Jones
to Willett, and gave them to Mrs. Jones on the same day. Mrs.
Jones testifies that in the fall of 1879, her husband handed both
assignments to her, and that she had them in her possession from
that time until February or March, 1884, when, at Mr. Werts's
request, she brought both of them to him for use, if he should
see fit, in connection with supplementary proceedings upon exe-
cution against her husband; and that she left them with Mr.
Werts, who never returned to her the assignment from Jones to
Willett. She is corroborated by Mr. Werts as to bringing them
to him and receiving back again only the assignment from Willett
to her. There is some corroboration of Jones's testimony on the
subject of his proposal to assign the judgment to the complain-
ants and their refusal to accept it, in the testimony of Mr. Werts
that the parties during the negotiations changed their plans.
He says that they consulted in one of his three rooms, and that,
after their consultations, they would come into the room in
which he sat and give directions as to what they wanted to have
done, and that, probably before he had complied with their
directions, they would have further consultation, and announce
that some other scheme or plan had been adopted, until, finally,
he told Jones, and he says he does not know but that he told
the complainants also (he thinks that probably they were all
there), that if they wanted him to draw the papers intelligibly
and so that they could be comprehended by others, they should
tell him just what they wanted to accomplish, and then he could
advise them as to what papers they wanted and could draw them.
He adds that he does not think that he got any very definite
directions or understanding from them; that they appeared to
change their plans while they were there, and that they adopted
two or three different plans. It is alleged in the bill that there
was an agreement drawn embodying the stipulations of the
parties, and Jones swears that there was such an instrument;
that he took it after it was executed, and that he is now unable
to find it. Mr. Werts testifies that Childs came to him shortly
before the bill was filed, and inquired whether he (Werts) had
not in his possession a paper or agreement wherein were stated

the full particulars of the arrangement. Jones says that an assignment of the Hedden judgment from him to the complainants was drawn by Mr. Werts on the 12th of August, but that it was not delivered, because the complainant would not accept it under the arrangement which he proposed. It is proved that on that day Mr. Werts drew an assignment of that judgment from Jones to Willett, and that it was then executed, and that on the same day, as part of the same transaction, he drew the assignment from Willett to Mrs. Jones, which states that the former assignment was made in order that Willett might make the latter. Mr. Werts says that he cannot say that the paper which Jones's son tore in his office was an assignment from Jones to the complainants. It is a very significant fact that he never heard from either of the complainants, so far as he can remember, of any claim to the Hedden judgment until shortly before the bill in this suit was filed, and it was not filed until August 19th, 1884.

The agreement between the parties as to the farm was, as before stated, that the complainants should buy the farm at the foreclosure sale and take title to it in their own names to secure them for the purchase-money which they should pay therefor. Jones says that they were to hold it until they could sell it for a fair price, and were not to sell it without his consent. Childs says, in his principal testimony, that he does not think that there was anything said, at the time when the agreement was made, about the complainants having absolute control of the farm ; and again, he says, that the agreement was that the complainants should " carry the property for Jones until he could turn himself," and that they took a deed in their own names so (as he understood it) that they could have absolute control over the property in case Jones should not do as he agreed. In his rebutting testimony he says that there was no agreement that they should hold the farm and not sell it without Jones's consent. He says that they could sell the property without Jones's consent and without asking him, and that they were the absolute owners of the farm. Dr. Willett says that the complainants were to have the property to secure them ; that they did not think

the farm was worth what they had to pay; that he does not know that there was any particular agreement about it; that they wanted to make their money out of the farm; that he does not know that there was any particular understanding about the sale of the property; that there was no contract made; that Jones could have the farm if he paid them the money which they paid for it, and that he does not know that there was any agreement whatever about Jones's consenting to a sale. The written agreement would have been conclusive evidence of the terms of the agreement. It went into the custody of Jones as alleged in the bill, and as he admits, and he declares that he is not able to produce it. It cannot be regarded, as established by the evidence, that there was a stipulation that there should be no sale except with the consent of Jones. But it is proved that the complainants took the title of the farm to secure them for the money paid for the property in buying the bank mortgage and purchasing at the foreclosure sale. The amount paid for both objects was, after deducting what was repaid, $9,715.82. It appears that they had no possession of the property for a while after the conveyance, and that they took possession when they found that Jones was not going to act according to his agreement with them. In or about 1880 they got $140, by condemnation proceedings, for about an acre, and the privilege of taking water &c. They sold to Foster another part, in 1881, for $160 an acre—realizing $4,407 (net) from the sale; leaving a large balance still due them, and a residue of the property unsold. Jones did not consent to the sale to Foster, but, on the contrary, protested against it as to the price. The only question to be considered on this part of the case is whether the complainants got a fair price from Foster for the property sold to him. Jones has produced nearly fifty witnesses who testify that that property was worth much more than the price obtained. None of them fixes the price at less than $250 an acre, and some fix it at from $300 to $400 an acre. These estimates are, almost all of them, mere opinions of persons not experts, and numerous as are the witnesses and positive as are their expressions of opinion, they are outweighed by the fact that the price obtained was the best

that could be got, and the purchaser one who was most likely to pay a full price for the property because of its relation to property he already owned. The property was sold by an experienced real estate agent in Morristown, who swears that he did not consider it worth more, at the time it was sold, than the price obtained, and that his opinion is based upon his own efforts to find a purchaser for it and his knowledge of the property, with which he was familiar. He says that he has been on it frequently for thirty years. It was not worth more than $100 an acre for farming purposes. Any additional value it may have had arose from its availability for a villa site or sites. But it was at the distance of between one and two miles from Morristown, on the road to Mendham, and in 1881 there was no demand for it for villa sites. Julius A. Drake, a real estate agent, in whose hands Jones placed it for sale, says that about that year he had an offer of $7,500 for it, based upon the understanding that it contained (as Jones said it did) forty-three acres; that is, the offer was of about $175 an acre. Jones declined the offer, and asked $10,000 for the property. Drake says the property had been in his hands for some time before that offer was made. Mr. Foster, the purchaser, owned an adjoining farm, known as the Revere property. He bought that in 1881. He says he gave $27,500 for it, and that, estimating the value of the buildings at somewhat near what he thought they would cost to build them, and what they were worth to him, he considered that the land cost him from $150 to $170 an acre. He next bought the property in question, and afterwards bought another adjoining tract, of about fifteen acres, on the other side, called the Gribben farm, for which he paid $200 an acre, but he says he considered it worth only about $100 an acre. He appears to have bought it because it was said that it was likely to be put to a use which would damage his other property very much. On the Jones land, there were no improvements of any value. Mr. Pitney says it had upon it a dwelling-house and a barn, both in a dilapidated condition and almost unfit for use; that the fences were valueless, and the land in as bad a condition as it well could be, and that he does not think that it was

worth, in 1881, more than $50 an acre for farming purposes. He says that the property had a value as a building site ; that there was one good building site upon it near the top of the hill, but, in his judgment, it was not large enough to be attractive to the kind of purchaser who would be expected to pay very much more than its value for farming purposes. In his opinion, the best way of disposing of the tract so as to realize the most money for it was that which was taken—to sell to Mr. Foster for the best price that could be got from him. Jones was aware that the complainants were about to sell to Foster, and, while he protested against selling at the price, he did not offer to redeem, nor did he produce any one who would give a better price; neither did he take any step to stop the sale. The complainants acted in good faith, and the price obtained appears to have been a fair one. They are not chargeable, in the account, with anything more for that part of the property than the net price which they obtained.